UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
*In re*:

BRET S. DIBATTISTA,

                                Debtor.

-----------------------------------------------------------------------x

BRET S. DIBATTISTA,

                                Plaintiff/Appellee,

   - against -

SELENE FINANCE LP,

                                Defendant/Appellant.

-----------------------------------------------------------------------x

**OPINION AND ORDER**

No. 19-CV-8118 (CS)

Appearances:
Carlos J. Cuevas
Francis J. O'Reilly
Law Office of Francis J. O'Reilly, Esq.
Carmel, New York
*Counsel for Plaintiff/Appellee*

Richard J. Davis
Stephen J. Bumgarner
Maynard, Cooper & Gale, P.C.
Birmingham, Alabama
*Counsel for Defendant/Appellant*

Seibel, J.

      Before the Court is the appeal of Defendant-Appellant Selene Finance LP ("Selene")[1]

from the Bankruptcy Court's July 23, 2019 "Order Holding Selene Finance, L.P. in Contempt for

---

     [1] The parties' names are spelled here based on how they spell their own names in their submissions to this Court.

Its Violation of the Discharge Injunction Under 11 U.S.C § 524(a) and to Sanction Selene Finance, L.P. [Under] 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 9020 and Awarding Sanctions Under 11 U.S.C. § 524(a)(2)." (Bankr. Doc. 30 ("Order").)[2] For the following reasons, the Order is AFFIRMED in part and VACATED and REMANDED in part.

I. **BACKGROUND**

On July 24, 2009, Plaintiff-Appellee Bret S. DiBattista filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. (Doc. 10-1 at 1.)[3] DiBattista owned real property located at 28 Wintergreen Avenue in Newburgh, New York (the "Real Property"), which was encumbered by a mortgage load held by Countrywide Home Loans, Inc. ("Countrywide"). (*Id.* at 11.) In the Statement of Intention filed with his Chapter 7 petition, DiBattista stated that he intended to retain the Real Property and continue making payments to Countrywide. (*Id.* at 34.)

On October 18, 2009, the Bankruptcy Court entered an order of discharge releasing DiBattista from all of his dischargeable debts. (*Id.* at 48.) The discharge order prohibited "any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a debtor by mail, phone, or otherwise, to file or continue a lawsuit . . . or to take any other action to collect a discharged debt from the debtor." (*Id.* at 49.) As a result of the discharge order, DiBattista was discharged from his personal liability on the mortgage note,

---

[2] References to "Bankr. Doc." refer to documents filed on the docket in the underlying proceeding in the Bankruptcy Court for the Southern District of New York under docket number 09-36978. References to "Doc." are to documents filed on this Court's docket.

[3] Appellants attached an appendix to their appeal brief, which, because of its size, was filed as two exhibits. (Docs 10-1, 10-2.) The appendix, however, is consecutively paginated across both exhibits, so it is cited herein as if it was a single appendix, referred to as "Selene's App."

although the lender retained its lien on the property and its right to foreclose upon default. Countrywide Home Lending received notice of the discharge order shortly thereafter. (*Id.* at 76.)

Selene states, upon information and belief, that DiBattista defaulted on his mortgage payment due December 1, 2012, and each mortgage payment thereafter. (*Id.* at 103-04.) On September 6, 2018, Countrywide assigned the note and mortgage to MTGLQ Investors, L.P., which then retained Selene to service the note and mortgage. (*Id.* at 104.)

On September 12, 2018, Selene sent DiBattista a letter with the heading "Validation of Debt Notice." (*Id.* at 78.) The first paragraph of the letter stated, "As of 09/12/2018, our records show that the current amount of the debt securing the above referenced loan is $279,186.39. Your current payment amount is $1,673.67 which is due for 12/01/2012." (*Id.*) The letter went on to say, in the second and third paragraphs, that

> Selene . . . is collecting the debt on behalf of MTGLQ Investors, L.P., and you may pay the debt to our office at the address indicated below. . . . Unless you notify Selene within thirty (30) days of receipt of this notice that you dispute the validity of the debt, or any portion thereof, Selene will assume the debt to be valid."

(*Id.*) The letter contained several disclaimers, one of which read, "Please note that if you are in bankruptcy or received a bankruptcy discharge of this debt, this communication is not an attempt to collect the debt against you personally." (*Id.* at 79.) As the Bankruptcy Court noted, the disclaimer was "at the bottom of the second page, and not very noticeable." (Doc. 18-1 ("Hearing Tr.") at 11:13-14.)

On September 13, 2018, Selene attempted to contact DiBattista via telephone, but he did not answer, so it left him a message. (Selene's App. at 104.) DiBattista returned the call the following day and confirmed his phone number, but did not provide any additional information to Selene. (*Id.*) Between November 29, 2018, and January 24, 2019, Selene called DiBattista and members of his family more than thirty times. (*Id.* at 72, 80-82.)

3

Additionally, in November 2018, Selene began reporting on DiBattista's credit report that he was 120 days past due on his mortgage payments. (*Id.* at 72; *see id.* at 83-86.)[4] DiBattista did not learn that Selene had reported this debt until January 2019, and in that same month, Selene reported to credit agencies that DiBattista was 180 days past due with payment. (*Id.* at 72.)

On January 22, 2019, Selene received a cease-and-desist letter from DiBattista's counsel. (*Id.* at 105; *id* at 87-88, *see id.* at 89 (Selene acknowledging receipt via fax on January 22).) In the letter, DiBattista's counsel explained that DiBattista's debt had been discharged in 2009 and that the discharged order was "mailed to your client." (*Id.* at 87.)[5] DiBattista's counsel went on to explain that the letter Selene had sent DiBattista and the phone calls it had made to him violated the discharge order, and therefore DiBattista demanded that Selene "immediately cease and desist any further attempt to seek collection of the pre-petition debt, and immediately take all necessary actions necessary to restore my client's credit to where it was prior [t]o your reporting . . . within 7 days." (*Id.*) DiBattista's counsel concluded that "[f]ailure on [Selene's] part to comply with this demand will lead my client to seek judicial intervention to have you held in contempt, whereby, you may be assessed sanctions, monetary penalties, or any other remedy the Court deems appropriate." (*Id.* at 88.) Selene made three more calls after receiving the letter. (*Id.* at 72, 82.)

On February 14, 2019, DiBattista filed a motion to reopen the bankruptcy proceedings to "enforce the discharge injunction." (Bankr. Doc. 15.) On March 6, 2019, Selene sent a letter to DiBattista's counsel stating it had received his January 22 letter by fax on that date. (Selene's

---

[4] DiBattista attested that it was in November 2019 that Selene began reporting his late payment, but that was a typographical error, as the affidavit was submitted in June 2019.

[5] The discharge order had actually been mailed to Countrywide.

4

App. at 89.) Selene stated that it began servicing DiBattista's mortgage account on August 30, 2018, and "upon review of the account, it was determined that prior to Selene's servicing of the account, it was discharged through a Chapter 7 Bankruptcy." (*Id.*) Selene further stated that it would "cease and desist all contact with the mortgagor; however, . . . Selene will continue to enforce its lien rights with respect to the property secured by the security instrument . . . [and] will continue to mail notices regarding matters related to the foreclosure of the property." (*Id.*) But Selene made clear that "[t]he notices are intended for informational purposes only as we acknowledge that Mr. Di[B]attista is not personally liable for the debt." (*Id.*) Selene also stated that it had "submitted an update to delete the credit reporting tradeline. This deletion will remove all credit reporting previously submitted by Selene." (*Id.*) DiBattista's counsel responded on March 15, 2019, stating that Selene's letter was late and "[a]s a result, my client was forced to hire our firm to protect his interest and draft and file a motion to reopen his bankruptcy case[.] My client has been further damaged by your firm's inaccurate credit reporting." (*Id.* at 134.) DiBattista attested that his credit score was reduced by sixty points due to Selene's credit reporting. (*Id.* at 72.)

On April 2, 2019, the Bankruptcy Court reopened the bankruptcy proceedings. (Bankr. Doc. 17.) On May 20, Selene's counsel communicated with DiBattista's counsel by phone and email, stating that Selene had "ceas[ed] any future collection efforts" and instructed the major credit reporting bureaus to delete its previous credit reporting. (Selene's App. at 136.) Selene offered to pay DiBattista's attorney's fees for filing the motion to reopen, (*id.*), but DiBattista's counsel stated his client intended to proceed with a motion for contempt sanctions, (*id.* at 139).

5

On June 14, 2019, DiBattista filed a motion for contempt for violation of the discharge order. (Doc. 19.) Selene opposed it, DiBattista replied, and Selene sur-replied. (Docs. 25-27.)[6] The Court held a hearing on July 26, 2019. At the hearing, Selene argued that it was reasonable to take forty-three days between receiving DiBattista's cease-and-desist letter and ceasing its collection efforts and sending updated information to the credit agencies, (Hearing Tr. at 9:4-7), but the Bankruptcy Court explained that "[i]t is absolutely egregious that someone is not looking at the electronic record before they do anything that damages an individual, as much as a poor credit report damages an individual," (*id* at 10:18-21.) The Bankruptcy Court added that DiBattista incurred

> actual damages. He needlessly suffered embarrassment, stress, and anxiety over the collection of the debt that had discharged. He and his family could not enjoy peace in their homes, as they were hounded by collection calls up to seven times a day. He had to contact his attorney, who had to take time writing a letter to Selene, and making a motion in this court to reopen the case, as well as negotiate with Selene."

(*Id.* at 10:23-11:6.) Accordingly, the Bankruptcy Court held Selene in contempt. (*Id.* at 10:22.)

The Bankruptcy Court then turned to damages, and stated that DiBattista "is awarded $500 per phone call, 35 times 500 is $17,000 [*sic*[7]] as actual damages. The initial letter should not be counted, as it contained the bankruptcy disclosure; though at the bottom of the second page, and not very noticeable." (*Id.* at 11:10-14.) The Court is also said it would award attorney's fees as well as filing fees, and directed DiBattista's counsel to submit an affidavit documenting those amounts. (*Id.* at 11:15-21.)

---

[6] In DiBattista's reply, he argued that Selene had violated Federal Rule of Evidence 408 by disclosing settlement discussions, (Doc. 26 at 3), but because the Bankruptcy Court stated at the hearing that it was not ruling on that issue, (Hearing Tr. 13:5 ("I'm not ruling. I'm staying out of that."), the Court likewise will not address it here.

[7] Thirty-five multiplied by 500 is 17,500.

On July 23, the Bankruptcy Court entered the Order. In it, the court stated:

> [H]aving found and concluded that Selene repeatedly and willfully violated [the] discharge order in an attempt to collect a discharged debt; and upon the declaration of Frank J. Corigliano, Esq. dated July [22], 2019 setting forth counsel's fees and expenses incurred in connection with enforcing the discharge injunction against Selene; and the Court having found and concluded that the Debtor reasonably incurred $9,046.60 of legal fees and expenses in enforcing the discharge injunction; and the Court having found and concluded that the Debtors[] are entitled to an additional $17,500.00 in punitive damages for phone calls made to Debtor in an attempt to collect a discharge[d] debt and erroneous and false credit reporting associated with such attempts in violation of the discharge injunction; and good and sufficient cause appearing, it is hereby
>
> **ORDERED**, that the motion is granted as provided herein; and it is further
>
> **ORDERED**, that Selene is held in contempt of this Court's Order under 11 U.S.C. § 524(a)(2) granting the Debtor a discharge of their pre-petition debt to it; and it is further
>
> **ORDERED**, that such contempt being willful, Selene is sanctioned in the amount of $26,546.60, comprising (a) actual damages in the amount of $9,046.60 representing reasonable legal fees and expenses for Selene's violation of the Court's discharge order and (b) punitive damages in the amount of $17,500.00 for phone calls made to Debtor in an attempt to collect a discharged debt and erroneous and false credit reporting associated with such attempts in violation of the discharge injunction . . . .

(Order at 1-2.)

On August 30, 2019, Selene filed the instant appeal. (Doc. 1.) On October 4, Selene filed its brief and appendix, (Doc. 10 ("Selene's Br.")),[8] on November 14, DiBattista filed his opposition, (Doc. 18), and on December 9, Selene filed a reply, (Doc. 24).

## II. LEGAL STANDARD

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final judgments, orders, and decrees of a bankruptcy court. "Generally in bankruptcy appeals, the

---

[8] Selene filed its brief twice, (Docs. 9-10), seemingly because it failed to attach its appendix to the first filing; there is no difference between the two briefs.

district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law *de novo*." *R² Invs., LDC v. Charter Commc'ns, Inc.* (*In re Charter Commc'ns Inc.*), 691 F.3d 476, 482-83 (2d Cir. 2012). "When reviewing for clear error, [the Court] may reverse only if [it is] left with the definite and firm conviction that a mistake has been committed." *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (internal quotation marks omitted). "Thus, if the factual findings of the bankruptcy court are plausible in light of the record viewed in its entirety, this Court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Savage & Assocs., P.C. v. Williams Commc'ns* (*In re Teligent Servs., Inc.*), 372 B.R. 594, 599 (S.D.N.Y. 2007) (internal quotation marks omitted). And "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (internal quotation marks omitted).

"On appellate review, this Court may set aside a bankruptcy court's order holding a party in contempt only for abuse of discretion, but such review is more exacting than under the ordinary abuse-of-discretion standard because a bankruptcy court's contempt power is narrowly circumscribed." *In re Blair Ventures, LLC*, 581 B.R. 728, 732 (S.D.N.Y. 2017) (internal quotation marks and alteration omitted). A bankruptcy court's award of sanctions is also subject to an "abuse of discretion" standard. *Solow v. Kalikow* (*In re Kalikow*), 602 F.3d 82, 91 (2d Cir. 2010). A bankruptcy court "abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *Klipsch*

*Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 627 (2d Cir. 2018) (internal quotation marks omitted).

### III. DISCUSSION

#### A. Whether the Bankruptcy Court Erred in Holding Selene in Contempt

Under 11 U.S.C. § 524, "a discharge order 'operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset' a discharged debt." *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting 11 U.S.C. § 524(a)(2)). Under § 105, a court may "'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'" *Id.* (quoting 11 U.S.C. § 105(a)). These two provisions together "authorize a court to impose civil contempt sanctions when there is no objectively reasonable basis for concluding that the creditor's conduct might be lawful under the discharge order." *Id.* In other words, "a court may hold a creditor in civil contempt for violating a discharge order if there is no fair ground of doubt as to whether the order barred the creditor's conduct." *Id.* at 1799.

"Under the fair ground of doubt standard, civil contempt therefore may be appropriate when the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." *Id.* at 1802. "This standard reflects the fact that civil contempt is a severe remedy and that principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Id.* (internal quotation marks, citation, and alteration omitted).

The fair ground of doubt standard is generally an objective one, but a party's subjective intent is relevant. *Id.* For example, "civil contempt sanctions may be warranted when a party acts in bad faith," and "[o]n the flip side of the coin, a party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." *Id.*

9

The proof of non-compliance must be clear and convincing. *In re 1990's Caterers Ltd.*, 531 B.R. 309, 319 (Bankr. E.D.N.Y. 2015).[9]

Selene's argument is in part based on its assertion that, "[f]or the Court to find a party in contempt 'the burden rests with the movant to show [by clear and convincing evidence] that the offending . . . entity had knowledge [actual or constructive] of the discharge and willfully violated it by continuing with the activity complained of.'" (Selene's Br. at 27 (second, third, and fourth alterations in original) (quoting *Torres v. Chase Bank USA, N.A.* (*In re Torres*), 367 B.R. 478, 490 (Bankr. S.D.N.Y. 2007).) This standard, however, does not seem to survive *Taggart*, where the Court held that "the absence of wilfulness does not relieve [a party] from civil contempt." 139 S. Ct. at 1802 (alteration omitted). The *Taggart* Court also explained that "a party's record of continuing and persistent violations and persistent contumacy justified placing the burden of any uncertainty in the decree on the shoulders of the party who violated the court order." *Id.* (internal quotation marks and alterations omitted). Accordingly, DiBattista need not prove that Selene acted willfully to be subject to a contempt order, and it is not entirely clear which party carries the burden on a motion for contempt, though it is likely still on the movant. In any event, the result here would be the same regardless of which party had the burden, as there is clear and convincing evidence that Selene violated the discharge injunction.

1. **Communications**

It is undisputed that Selene made more than thirty phone calls to DiBattista and his family between November 2018 and January 2019, including three calls after Selene received

---

[9] The *Taggart* Court did not discuss whether the clear-and-convincing standard is still appropriate on a civil contempt motion, but cases that have dealt with such motions post-*Taggart* have continued to use the clear-and-convincing standard. *See, e.g.*, *Calvillo Manriquez v. Devos*, 411 F. Supp. 3d 535, 540 (N.D. Cal. 2019).

DiBattista's cease-and-desist letter. (*See* Selene's App. at 82 (three calls made on January 24, 2019); *id.* at 89 (Selene acknowledging receipt of DiBattista's letter via fax on January 22).) But Selene argues that "there were no requests during any call to DiBattista that he remit payment to Selene," and "the sole purpose of any such calls to DiBattista was to determine his intentions regarding the Real Property." (Selene's Br. at 24 (emphasis omitted).) But this argument is refuted by the record, and thus the Bankruptcy Court did not err by rejecting it.

First, the Bankruptcy Court did not err in determining that Selene's more than thirty calls to DiBattista and his family were made in an effort to collect a debt. The onslaught of calls was immediately preceded by a standard debt-collection letter titled "Validation of Debt"[10] and accompanied by reporting to credit agencies that DiBattista himself was past due on debt payments. (Selene's App. at 72, 78-79, 83-84.) Neither of these latter steps would have been necessary had Selene intended only to learn of DiBattista's intentions with regard to the Real Property. The letter gave no indication that Selene was interested in DiBattista's intentions, and every indication that it wished to collect the debt described therein. No rational servicer, merely curious about the borrower's intentions, would persist more than thirty times in calling when the borrower declined to engage in the first call and it was obvious thereafter that the borrower was not going to respond. The barrage of calls was plainly intended to pressure DiBattista to pay, not to help Selene decide whether to foreclose. And reporting the debt to credit agencies would not assist Selene in foreclosing but would pressure the borrower to pay.

---

[10] While the letter had a bankruptcy disclaimer, it was inconspicuously placed among other disclaimers at the bottom of the second page, and is seemingly included in all of Selene's correspondence, regardless of whether the correspondence could be construed as seeking payment of a debt, (*see* Selene's App. at 90), and thus its inclusion does not support Selene's assertion that it did not intend to seek payment of the debt by sending the letter.

Moreover, Selene's counsel admitted at the hearing before the Bankruptcy court that "my client . . . has accepted liability." (Hearing Tr. at 8:4-6.) Selene's March 6 letter to DiBattista also acknowledged as much, as Selene stated it would "cease and desist all contact with the mortgagor," except that it would mail him "notices regarding matters related to the foreclosure of the property," and that it had notified the credit agencies to delete the previous credit reporting. (Selene's App. at 89-90.)

Selene argues that phone calls alone, without any evidence that they were made to collect a debt, cannot be considered to violate the discharge order, citing to *In re Cantrell*, 605 B.R. 841 (Bankr. W.D. Mich. 2019), in which the bankruptcy court in the Western District of Michigan found that the debtor "failed to meet her burden of proving that the phone calls placed by [creditor] to the Debtor were attempts to collect the mortgage debt in violation of the discharge injunction." *Id.* at 859. There, the debtor received thirteen calls over the span of less than one month, but there was "no evidence upon which the court could conclude that [the creditor] was attempting to collect the debt as a personal liability of the Debtor during these calls." *Id.* That is simply not the case here, as the calls were accompanied by a Validation of Debt letter and representations to credit agencies that DiBattista was delinquent on his payments. And as the *Cantrell* court held, a determination of whether a creditor violated a discharge injunction "requires consideration of all of the circumstances of a particular case." *Id.* at 854. When analyzing all of the evidence here, the Bankruptcy Court did not clearly err in finding the calls were made for the purpose of collecting a debt.

Further, courts within this circuit have found that a high volume of calls related to a note, which "were not technical, unintended, or quickly remedied, but were in fact wanton and oppressive," can form the basis of contempt sanctions. *In re Haemmerle*, 529 B.R. 17, 29

(Bankr. E.D.N.Y. 2015). Here, Selene's more than thirty calls to collect a discharged debt cannot be considered technical, unintended, or quickly remedied. Regardless of whether Selene had actual or constructive notice of the discharge from its client, the most basic research would have revealed the discharge;[11] Selene continued to make calls after it got the cease-and-desist letter; and it did not remedy the issue with the credit agencies until forty-three days after it received that letter. Accordingly, the Bankruptcy Court did not clearly err by finding that the more than thirty calls, analyzed within the context of the other actions Selene took, were for the purpose of collecting the discharged debt and therefore violated the discharge order.

Selene next argues that "[b]ecause Selene's calls were made for permissible purposes, there was 'fair ground of doubt as to whether the order barred the creditor's conduct,' precluding the entry of contempt sanctions against Selene under § 105." (Selene's Br. at 25 (emphasis omitted) (quoting *Taggart*, 139 S. Ct. at 1799).) But for the reasons stated above, this argument is rejected. While there are circumstances in which a creditor may contact a debtor without it being "*per se* improper," *In re Cantrell*, 605 B.R. at 853 – such as informing the debtor of a possible foreclosure – the Bankruptcy Court correctly found that those circumstances were not present here. Its conclusion that the calls were impermissibly made to collect the debt, based on the evidence described above, was not clearly erroneous, particularly given that it was not presented with admissible or credible evidence to the contrary.[12] In fact, at the hearing before

---

[11] As the Bankruptcy Court noted, in this age of electronic systems it is egregious for a mortgage servicer not to do basic research before taking action. (Hearing Tr. at 9:9-12, 10:18-21.)

[12] The Bankruptcy Court acted more than reasonably in rejecting the unsupported claim that Selene's actions were meant only to determine DiBattista's intention with regard to the Property. For this assertion, Selene relied on the affirmation of Erina Fitzgerald, Selene's counsel, submitted to the Bankruptcy Court in opposition to DiBattista's motion. (Selene's Br. at 22 (citing Selene's App. at 109).) But Fitzgerald's affirmation stated, "Upon information and

13

the Bankruptcy Court, Selene admitted its liability and primarily argued that the forty-three-day delay between receiving DiBattista's cease-and-desist letter and ceasing its collection efforts and remedying its inaccurate credit reporting was reasonable. (Hearing Tr. at 8:6-9:7.)[13] Accordingly, the Bankruptcy Court did not err by finding that there was no fair ground of doubt that Selene's phone calls to DiBattista, along with its other conduct, violated the discharge order as impermissible attempts to collect a debt, and therefore warranted contempt sanctions.

2.     **Reporting to Credit Agencies**

Selene next argues that "failure of a furnisher of credit information to take affirmative steps to update the information that it has reported on a consumer's account is not, standing alone, a violation of 11 U.S.C.A. § 524(a)(2)." (Selene's Br. at 25-26.) Further, Selene argues that "upon receipt of correspondence from DiBattista's counsel, Selene promptly updated the information provided to the credit reporting bureaus regarding the mortgage loan," and thus there

---

belief, . . . Selene continued to reach out to the Debtor to determine what the Debtor's intentions were with regard to the Real Property and to send notices which New York State law requires lenders to send prior to the commencement of foreclosure actions." (Selene's App. at 104-05.) While there are circumstances under which allegations upon information and belief are acceptable, this is not one of them. In the context of pleadings, the Second Circuit "has generally found that 'allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge.'" *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-CV-8190, 2016 WL 1275659, at *5 (S.D.N.Y. Mar. 30, 2016) (quoting *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008)). But here, Selene knows Selene's intentions, and there is thus no reason why Selene would have to make assertions on that subject on "information and belief." Had Selene's intention actually been merely to determine what DiBattista planned to do with his property, as opposed to seeking payment of the debt, a representative of the company with knowledge could have so attested. The failure of any such person to back up the argument is not surprising, given that, as described in the text, Selene's letter, calls, and reporting to credit agencies all consistently suggest that it was attempting to collect the debt.

[13] As the Bankruptcy Court noted, Selene's argument was meritless, as it should have "check[ed][itself]" whether DiBattista's debt had been discharged before attempting to collect it and reporting it to the credit agencies. (*See* Hearing Tr. at 9:9-12.) And Selene presented no reason why it would take almost a month and a half to do the ministerial work necessary to rectify the situation.

14

"was no evidence of any 'deliberate refusal' by Selene to provide an update to the credit reporting bureaus or that Selene willfully provided inaccurate information to the credit reporting bureaus before receiving the letter from DiBattista's counsel." (*Id.* at 28.) But these assertions mischaracterize the applicable legal standard, Selene's conduct, and the Bankruptcy Court's findings. Selene did not passively fail to update accurate information it had previously furnished. It affirmatively sent delinquency notices to the credit agencies regarding an already-discharged debt, and the Bankruptcy Court found that sending that information, without even the slightest diligence to ensure that the information reported was accurate, combined with the other correspondence that Selene sent to DiBattista and his family, was an "egregious" violation of the discharge order. (Hearing Tr. at 10:18.)

The creditors in nearly all of the cases that Selene cites had sent past-due notices to credit agencies prior to the debtors' discharges, and then failed to update or correct that information after the discharges. *See Bruno v. First USA Bank, N.A.* (*In re Bruno*), 356 B.R. 89, 90 (Bankr. W.D.N.Y. 2006) ("Prior to the filing of the Petition, the Defendant, Chase, had made a report, in the ordinary course of business, to a credit reporting agency. . . . At no time after the filing of the Petition did Chase communicate with the Debtor or the Debtor's attorney or make any affirmative attempt to collect the debt. Neither did Chase further report to the credit reporting agency."); *Irby v. Fashion Bug* (*In re Irby*), 337 B.R. 293, 294 (Bankr. N.D. Ohio 2005) ("'Defendants have continued to report that there is a balance owed on the debt that was discharged by this Court on July 25, 2005.'"); *Vogt v. Dynamic Recovery Servs.* (*In re Vogt*), 257 B.R. 65, 70 (Bankr. D. Colo. 2000) ("[T]he Defendant [cannot] be faulted, under section 524, for refusing to correct this [credit] report."). That contrasts with the facts of this case, where Selene reported the past-due notices to the credit agencies only after the discharge order was issued. In

15

other words, those cases may stand for the proposition that there is no affirmative duty to correct a credit report post-discharge, but that says nothing of whether a new report prepared only after the discharge is sanctionable. Additionally, the courts in both *In re Irby* and *In re Vogt* acknowledged that reporting a debt after a discharge, coupled with other actions undertaken to collect the debt, could violate the discharge injunction. *See In re Irby*, 337 B.R. at 296 ("But since the act, itself, does not violate the discharge injunction, the reporting of the debt will not likely run afoul with the discharge injunction unless it is also coupled with other actions undertaken by the creditor to collect or recover on the debt."); *In re Vogt*, 257 B.R. at 71 ("False reporting, if not done to extract payment of the debt, is simply not an act proscribed by the Code. There is absolutely no showing in this case that the Defendant had manufactured a false report in order to extract payment."). Such other actions were undertaken here, where Selene not only reported misleading credit information but also sent a Validation of Debt letter and made more than thirty calls to DiBattista and his family, all suggesting that Selene was attempting to collect the debt.

Additionally, even if there were no additional collection activity, the Court is not persuaded by the out-of-district cases (and mostly out-of-circuit cases) on which Selene relies. In fact, Judge Robert D. Drain distinguished *In re Bruno*, *In re Irby*, and *In re Vogt* in a bankruptcy case in this District. *In re Torres*, 367 B.R. at 485-87. In so doing, he noted that "[o]ther courts have had no difficulty recognizing that false or outdated reporting to credit reporting agencies, even without additional collection activity, can constitute an act to extract payment of a debt in violation of section 524(a)(2)." *Id.* at 486 (collecting cases). He explained how

> a credit report that continues to show a discharged debt as "outstanding," "charged off," or "past due" is unquestionably inaccurate and misleading, because end users

16

will construe it to mean that the lender still has the ability to enforce the debt personally against the debtor, that is, that the debtor has not received a discharge, that she has reaffirmed the debt notwithstanding the discharge, or that the debt has been declared non-dischargeable.

*Id.* at 487-88. Here, Chief Bankruptcy Judge Cecilia G. Morris adopted similar reasoning, explaining that it was "absolutely egregious that someone is not looking at the electronic record before they do anything that damages an individual, as much as a poor credit report damages an individual." (See Hearing Tr. at 10:18-21.) This Court too finds that reasoning persuasive. A credit report that continues to show an amount past due, especially one that was prepared only after the discharge order, is inaccurate and misleading in a way that causes real harm, and that alone can constitute a violation of a discharge order.

Put simply, this is not a case in which a creditor merely neglected to update credit agencies after a discharge. Instead, Selene proactively sent misleading information to credit agencies, suggesting it was in fact trying to collect a debt, especially when taken together with Selene's correspondence and calls to DiBattista and his family. Therefore, the Bankruptcy Court did not clearly err by finding that Selene violated the discharge order.[14]

---

[14] Selene also relies on *In re Helmes*, 336 B.R. 105, 108 (Bankr. E.D. Va. 2005), in which a court concluded that a bank did not violate the discharge order when, as a result of a clerical error, it reported a debt as past due instead of discharged. But the *In re Hermes* decision relied on the then-current legal standard that "[a]n unwitting or unintentional act does not violate the discharge stay," *id.* at 109, and *Taggart* seemingly retired this standard. The *Taggart* Court explained that "the absence of wilfulness does not relieve from civil contempt," and "a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." *Taggart*, 139 S. Ct. at 1802 (alteration omitted). Accordingly this Court doubts that *In re Hermes* would come out the same way today. Further, in that case, unlike here, "[n]o other efforts were taken to collect the debt," and "[t]he bank did not refuse to correct the error and did not make correction difficult." 336 B.R. at 109. And, of course, an Eastern District of Virginia Bankruptcy Court ruling is not binding on this Court. Accordingly, I am not persuaded by *In re Hermes*.

### B. Whether the Bankruptcy Court Erred in Imposing Sanctions on Selene

Selene next argues that the Bankruptcy Court impermissibly imposed punitive sanctions against it. (Selene's Br. at 28-33.)

"It is well established that bankruptcy courts have power to enter civil contempt orders" and "[t]he power to impose civil contempt sanctions." *In re Markus*, 607 B.R. 379, 394 (Bankr. S.D.N.Y. 2019). What is not as clear, however, is whether a Bankruptcy Court has the authority to impose punitive sanctions for contempt. *See PHH Mortg. Corp. v. Sensenich*, No. 16-CV-00256, 2017 WL 6999820, at *7 (D. Vt. Dec. 18, 2017) (collecting "decisions which restrict the authority of the bankruptcy courts to impose punitive sanctions"). *But see In re Haemmerle*, 529 B.R. at 31 (bankruptcy court imposing punitive sanctions and adding "courts are called upon to exercise their discretion to determine what punitive sanction is appropriate and reasonable"). In fact, this exact question is currently under consideration by the Second Circuit. *In re Gravel*, No. 20-1 (2d Cir. Feb. 21, 2020).

Here, however, it is not clear whether the $17,500 in sanctions the Bankruptcy Court imposed on Selene were compensatory or punitive. At the hearing, where the Bankruptcy Court made its contempt finding, it stated it was awarding DiBattista "$500 per phone call, 35 times 500 is $17,000 [*sic*] as actual damages," (Hearing Tr. at 11:10-11), but in the written Order, it ordered Selene to pay "punitive damages in the amount of $17,500.00 for phone calls made to Debtor in an attempt to collect a discharged debt and erroneous and false credit reporting associated with such attempts in violation of the discharge injunction," (Order at 2). While DiBattista argues that the $17,500 was compensatory damages based on the Bankruptcy Court's ruling from the bench that characterized that award as "actual damages," Selene argues that the words "punitive damages" in the Order should control.

Selene's position is supported by the fact that the court in *In re Haemmerle* (on which DiBattista relies), imposed a "punitive sanction" of "$500 for each knowing violation" and awarded punitive damages in an amount calculated by multiplying $500 by the number of collection calls made, which is just how the Bankruptcy Court here calculated damages at the hearing. This is also consistent with the language in the Order that suggests the punitive damage award was calculated based on the number of calls. But DiBattista's position is supported by the Bankruptcy Court's statement at the hearing that DiBattista incurred "actual damages. He needlessly suffered embarrassment, stress, and anxiety over the collection of the debt that had discharged. He and his family could not enjoy peace in their homes, as they were hounded by collection calls up to seven times a day." (Hearing Tr. at 10:23-11:2.) This suggests that, at the very least, a portion of the $17,500 was awarded for actual damages, which is permissible as "[c]ivil contempt sanctions may also compensate for any harm that previously resulted," *In re Markus*, 607 B.R. at 395, including emotional distress, *see In re Haemmerle*, 529 B.R. at 26-27 (collecting cases). *But see Burd v. Walters* (*In re Walters*), 868 F.2d 665, 670 (4th Cir.1989) (vacating emotional distress damage award because no authority was cited to support emotional distress damages for civil contempt).

Additionally, while the Order used the term "punitive damages," that language was copied directly from a proposed order that DiBattista had submitted to the Bankruptcy Court, (Bankr Doc. 21-9), and the inclusion of that term in the Order may have been an oversight.

Accordingly, the Court vacates the sanction of $17,500 and remands this case to the Bankruptcy Court for the sole purpose of reconsidering damages (apart from the $9,046.60 representing reasonable legal fees and expenses). To that end, the Bankruptcy Court should

clarify whether it is imposing actual damages, punitive damages or both, and how the calculation was reached.

## IV. CONCLUSION

For the foregoing reasons, the Bankruptcy Court's Order is AFFIRMED in part and VACATED and REMANDED in part. The Bankruptcy Court's finding of contempt is affirmed, as is its imposition of sanctions for fees and expenses in the amount of $9,046.60. The Bankruptcy Court's Order is vacated as to the $17,500 it awarded to DiBattista, and the case is remanded to permit the Bankruptcy Court to enter another sanction within its sound discretion, with an explanation of the type of award and its basis.[15] The Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

Dated: April 9, 2020
 White Plains, New York

 _____
 CATHY SEIBEL, U.S.D.J.

---

[15] Selene's request for oral argument is denied.